**Tiffany HOWEY by Next Friend Clark and Patricia HOWEY (parents), and Clark Howey and Patricia Howey, Plaintiffs,**

v.

**TIPPECANOE SCHOOL CORPORATION (TSC) and Greater Lafayette Area Special Services (GLASS), Defendants.**

**Civ. No. L 88–76.**

United States District Court,
N.D. Indiana,
Hammond Division.

Jan. 26, 1990.

Thomas J. Herr, Lafayette, Ind., for plaintiffs.

James V. McGlone and Stephen R. Pennell, Lafayette, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I.

The complaint in this case was filed on October 3, 1988, by these plaintiffs against the defendant, Tippecanoe School Corporation (TSC) and Greater Lafayette Area Special Services (GLASS). The case was also filed as against other defendants who have been previously dismissed. On its face, the complaint purports to assert a claim for attorney fees and costs under 42 U.S.C. § 1988, and 20 U.S.C. § 1400 *et seq.*

After the case had gone through extensive proceedings, an evidentiary hearing was held in Lafayette, Indiana, on January 8 and 11, 1989. That evidentiary hearing has now been completed, oral arguments have been heard, and a time has been allowed for the filing of supplemental briefs, which have been filed and examined. It is of little relevance, but specificity requires it to be stated that the claim for attorney fees and costs is under the Handicapped Children's Protection Act [HCPA] of 1986 as found at 20 U.S.C. § 1415(e)(4)–(f). The relevant legislative history of that statute is explicated by Judge Ellis in *Rossi v. Gosling*, 696 F.Supp. 1079 (E.D.Va.1988), and even more recently in *Shelly C. by Shelbie v. Venus Independent School District*, 878 F.2d 862 (5th Cir.1989). Certainly, *Shelly* is authority for the proposition that summary judgment was not appropriate and an evidentiary hearing was necessary. Additionally, Judge Duhe, speaking for the court in *Shelly* at page 864 indicated that the legislative history of HCPA involved the Congress looking to 42 U.S.C. § 1988 for guidance. *Shelly*, also stands for the proposition that in such a statutory proceeding where a case is resolved by consent decree, fees may be available under HCPA where the complainant obtains the desired relief short of a formal administrative proceeding. *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1988) is cited for that proposition. Since § 1988 has been declared to be a highly relevant historical reference for interpreta-

tion, the unanimous decision of the Supreme Court of the United States authored by Justice O'Connor in *Texas State Teachers' Association v. Garland Independent School District*, —— U.S. ——, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) becomes relevant guidance. On page 1493, Justice O'Connor states:

> "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner in which congress sought to promote in the fee statute. When such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award under *Hensley*, [*Hensley v. Eckerhert*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ] ... not to the availability of a fee award *vel non*".

In *Hensley* it was strongly suggested that "the request for attorneys' fees should not result in a second major litigation." 461 U.S. at 437, 103 S.Ct. at 1941. Such is precisely what has happened here.

For a very recent example of the applicability of the prevailing party concept under 42 U.S.C. § 1988, see the comprehensive and well crafted opinion of Judge Barker in *Hutchinson v. Wells*, 719 F.Supp. 1435 (S.D.Ind.1989). *See also* Part IV of Judge Easterbrook's opinion in *Kurowski v. Krajewski*, 848 F.2d 767, 776 (7th Cir.1988).

This memorandum will also comply with this court's obligation to enter written findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

### II.

This case springs out of proceedings held in 1987 involving the education of Tiffany Howey, a daughter of Clark and Patricia Howey, who is a primary grade school student in the Tippecanoe School Corporation and is seriously handicapped.

Consistent with this court's obligation to be specific under *Andre v. Bendix Corp.*, 774 F.2d 786 (7th Cir.1985);[1] this court

---

1. This court has no desire to engage in the kind of judicial pull and tug that is evident in *Jones v.*

*Jones Brothers Construction*, 879 F.2d 295 (7th Cir.1989) and 888 F.2d 1215 (7th Cir.1989).

must walk through in a highly detailed manner the factual situation that is involved in this case. Although one could not necessarily tell it by reading the briefs that were submitted, when the facts are carefully distilled, there is much agreement about what happened. However, there are vastly different offerings of legal and factual conclusions.

Tiffany Howey has Ehlers' Danlos Type IV and was classified to be physically handicapped in October, 1985, while in kindergarten. She entered the second grade at the beginning of the school year in the late summer or early fall of 1987. At that time her parents, plaintiffs here, and the school corporation, defendant here, agreed to several individual educational plans (IEP'S). The last of these appears to have been in March of 1986. Her mother met with a Judy Skelton and other representatives of the defendant GLASS for a case conference to prepare an IEP for the 1987–88 school year on June 10, 1987. This IEP apparently was a composite collection of information which Mrs. Skelton had developed from this child's first and second grade teachers, from the GLASS occupational therapist, Celeste Drysdale, and the GLASS physical therapist, Susan McCoy, as well as other reports and evaluations. At this conference, the child's mother presented her own IEP and the same was reviewed by the GLASS staff. At that time, compromised agreement was reached on a number of issues, but there remained disagreement on others. Two days later, Mrs. Skelton forwarded to Tiffany's mother the proposed IEP, which included an appropriate adapted physical education (APE) program for this child as a direct service by a person who was qualified and aware of this child's condition. Such was to begin in the Fall after the child had been evaluated by the School Adaptive Physical Education Teacher. The child was also to receive speech and hearing services that might be needed based upon evaluations which were to be completed by September 3, 1987. These evaluations were to be done by the school therapist, a Mrs. Batta. The audiological evaluation was to have been done at Purdue University, which is under contract with the school corporation to perform such evaluations. In this same time frame, the school corporation also offered to provide direct occupational therapy by having its therapist work directly with this child to teach her keyboard skills and implement joint protection and conservation procedures. It was also offered to provide direct physical therapy services by having the school therapist work directly with this child to monitor her gait and physical endurance in the class room, her use of needed adaptive equipment, and to provide and implement as necessary her equipment for her to function with comfort and efficiency in the school. It was further offered to provide transportation as a related service at the same rate of compensation allowed to other parents of the handicapped children. Plans were also made for an additional case conference to be held September 3, 1987, to review the OT and the PT reassessment reports, the APE Plan for the first semester and any new medical information developed over the Summer. Certainly, reality required all to understand that there were and would be changes in the medical condition of this child requiring some additional services. Those were not fully determinable in the summer of 1987.

Approximately, a month later, on July 14, 1987, Mrs. Skelton contacted the child's mother regarding this proposed IEP. Such was by letter. A letter which stated, in part, that the child would received preferential seating, a benefit which she had been receiving ever since she was in kindergarten. The school had purchased a Zygo notebook computer, which was for this child's use and Mrs. Skelton indicated that the same would be again available at the beginning of the fall school year. The child's mother declined to accept the aforementioned offer of benefits and services.

The pull and tug in these negotiations appeared to deal not so much with what services were to be provided, but rather who would provide and pay for those services. Although the record is somewhat variable, it appears that the mother of this child often did not want school personnel to deliver therapy and services, at least at that point in time. It appears, at least in the Summer of 1987, that the mother of

this child had taken a very hard line that the therapists and doctors were to be of her selection. Specifically, the mother insisted that Debra Baker, an occupational therapist at Home Hospital, Lafayette, Indiana, deliver occupational therapy and that the school pay for it to the extent that such was not covered by insurance. In the same vein, the mother insisted, in the Summer of 1987, that this child receive a monthly physical evaluation from Marsha Willan, their privately selected physical therapist. Also, it was insisted by the mother of this child that the Purdue University APE program be included with costs of the same borne by the defendant school corporation. The mother also demanded that this child should receive hearing examinations conducted by an audiologist in the office of a Doctor Berner, the ENT doctor for this child, and the costs of the same to be paid fully by the defendant school corporation. The mother also insisted that the defendant school corporation pay the cost of transporting the child to her therapist and to the facilities at Purdue University.

In the context of these fairly tense negotiations, the mother of this child revoked her consent for exchange of medical information on June 23, 1987. The implications of such are discussed later in this memorandum, but as a factual matter, the practical effect was to preclude the defendant school corporation from directly obtaining any medical information which might be provided by this child's doctors and therapists. The factual result would be that such impaired the ongoing process of evaluation by the school corporation. To be sure, attempts were made to have evaluations, which might be needed at the beginning of fall semester in 1987, but the child's mother refused to provide the school with her consent to have these evaluations performed. To be even more specific, the child's mother would not consent to having a doctor's prescription provided which would allow the school to obtain a physical therapy evaluation by its own therapist. The child's mother did indeed provide a limited consent which would have permitted the school to implement the services recommended by their own private therapist, Marsha Willan. In this same vein, the

child's mother would not consent to having the school's adaptive physical education teacher perform an APE evaluation. This rather tense period of negotiations extended into the school year in the Fall of 1987. The child's mother, on October 8, 1987, instructed the school that this child should not engage in any physical education activities until after the upcoming administrative hearing was completed. In that context, the school authorities requested the child's mother to consent to allowing the school to perform speech and hearing evaluations, but such was declined.

The above is a brief, but hopefully accurate summary, of the basic state of negotiations between the child's mother and the school authorities in the late Summer and early Fall of 1987. On August 21, 1987, their formal complaint for an administrative hearing was filed.

However, as a prelude to that administrative hearing further negotiations took place. The school was represented by the law firm of Bose, McKinney & Evans, through Margaret M. Bannon. On September 18, 1987, Ms. Bannon formally offered settlement. The long and the short of the September 18, 1987, letter was to again place on the table those things that have been offered on June 10, 1987, at the case conference. Specifically, the letter offered to provide occupational therapy as a direct service by having the school's therapist, Mary Ann Zander, provide joint protection and functional performance in the course of keyboarding instruction. Direct physical therapy was offered by having the school's physical therapist, Ms. McCoy as well as Ms. Zander, work directly with the child to help her with her adaptive equipment and to adjust the equipment on the basis of need. Also offered, was to have the child evaluated by Debra Tillett, the APE teacher for GLASS, who would devise an appropriate adaptive physical educational program for the child. Also, it was offered to have the child's speech evaluated to determine her need for further speech services. It was also offered to have the child's hearing evaluated by personnel from Purdue University every two months and, if necessary, to have serial testing

accomplished. An offer was made to reimburse the parents of the child for the cost of transportation, which would include compensation for the driver's time as well as mileage. Such offer was not accepted. Permission was not granted to have evaluations performed for adaptive physical education, speech, hearing, or physical therapy.

As indicated elsewhere, the hearing went forward over a period of time covering six days and forty-seven hours in the late fall and early winter of 1987. The school contends, and this court finds it to be factually correct, that the failure of the parents of this child to consent for the exchange of medical information or permission to complete the evaluations which had been offered, put school authorities in a very difficult position in attempting to offer proper services and benefits that had been proposed for this child.

However, the negotiations continued between the parties and counsel, even into the hearing, particularly on November 9, 1987. The hearing officer, Jean Rawson, met them with the attorneys and parents and attempted at least an interim settlement. Counsel for the school again offered to provide a speech evaluation for the child, if authorized by the parents. Such was accepted. Ms. Batta was permitted, at last, to give this child a speech evaluation. As a result thereof, direct speech services began for this child on December 1987.

Counsel for the school also offered to have the school occupational therapist work with the child on keyboarding. Again, this was agreed to and for the first time, the school's occupational therapist was permitted to work with the child to teach keyboarding. Notwithstanding the spirit of this settlement agreement, the mother of the child appears to have remained adamant that she did not believe that the school could provide an appropriate program for this child and would continue taking the child to Debra Baker. In regard to physical therapy, counsel for the school, indicated that the school's therapist could not provide any services directly to the child because the parents had not yet provided permission for the same. The school officials offered to have an APE evaluation performed by Ms. Tillett and to make her services available to the child to implement an appropriate APE program. This offer was again placed on the table, which was the same offer that had previously been made. This renewed offer was accepted, again for the first time, by counsel for the parents, who indicated that the parents would not object to having the school's APE teacher work with the regular APE teacher to provide an APE program for the child. The parents remained adamant that the evaluation by their own APE consultant, Dr. Aufderheide, be controlling. Counsel for the school again renewed the offer to provide tutoring as needed based upon a determination by the child's classroom teacher, but was not willing to provide tutoring one hour a week as had been requested by the parents of the child. During this settlement process, the hearing officer apparently volunteered that the school was not obligated to provide tutoring for one hour each week. Previously, the mother of the child had insisted upon tutoring for one hour a week for every three hours of missed class time, but apparently, this position was not maintained by the child's mother and it was finally agreed to leave the matter of tutoring to the discretion of the child's class room teacher. The hearing officer entered her decision January 7, 1988, that decision is attached hereto and incorporated herein by reference as "Appendix A". Therefore, a summary of the same is not necessary and would overburden an already overburdened memorandum and order. Although much verbiage is advanced by the lawyers in this case for both parties in regard to who prevailed in this administrative hearing, this court is not necessarily adopting in toto the position of any counsel or, indeed, the hearing officer herself.

### III.

■ The hearing officer opined under oath in the trial of this case that the decision was in favor of the school authorities because no significant relief was granted to the parents of this child which had not been offered in the Summer of 1987. That is very impressive testimony, and a conclusion that this court is all too tempted to

fully adopt. The point at which this court partially parts company with the hearing officer and with the defendant's counsel, has to do with the settlement that was achieved during the course of this hearing. Such is in the nature of a consent decree and although substantially all that was agreed to had been on the table before, the law with regard to prevailing parties and consent decrees tilts ever so slightly in favor of this plaintiff. This decision is an act of generosity to these plaintiffs and this court is sorely tempted to tilt in the other direction.

This court is of the very strong opinion that litigation continued in this case in an extensive and expansive fashion after these plaintiffs had achieved most, if not all, of the substantial results with regard to an appropriate public education for this child. It is for that reason as discussed below, that this court has reduced the claimed attorney fees in the administrative proceedings and has reduced Mr. Herr's fees the proceedings for this case. It is all too apparent in the record of this case that these plaintiffs and their counsel have engaged in a large scale attempt to punish these defendants for the latters past perceived sins. To the extent that such has happened, and it has, these defendants are not obligated to pay counsel fees for the same, if these defendants took appropriate and timely corrective actions to provide this child with an free appropriate public education. Here, these defendants have done just that. It is to be noted in this regard, that Judge Bua engaged in a similar diagnosis of the factual record in his excellent and comprehensive published opinion in *Max M. v. Illinois State Board of Education*, 684 F.Supp. 514 (N.D.Ill.1988) *aff'd* 859 F.2d 1297 (7th Cir.1988). This court is also impressed with Chief Judge O'Connor's reading of the *Texas State Teachers' Ass'n* case in *Ortega v. The City of Kansas City, Kansas*, 723 F.Supp. 1426 (D.Kan. 1989). Chief Judge O'Connor quite correctly and accurately says that the Supreme Court reversed and rejected the so-called central issue test and held that the threshold to a fee award is crossed by a plaintiff who has succeeded on "an significant issue in litigation which achieves some of the benefit the party sought in bringing the suit". He then proceeds to apply that test to the facts in *Ortega* and holds that the threshold has not been crossed. He further states:

> "The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner in which Congress sought to promote in the fee statute." 723 F.Supp. at 1427 quoting from *Texas State Teachers' Ass'n*.

Because and only because of the agreement that was reached during the administrative proceedings, the plaintiffs barely and partially come within the teaching of Justice O'Connor in *Texas State Teachers' Association v. Garland*.

■ With regard to the hourly rate, the court is providing an across the board rate of $75.00 an hour for Mr. Miller in the administrative hearing, but no allowance for him in this case, and an across the board allowance of $100.00 an hour for Mr. Herr, substantially reduced in this case. Such across the board allowances have been expressly approved in *Tomazzoli v. Sheedy*, 804 F.2d 93 (7th Cir.1986). Mr. Millers professional efforts were not necessary in this case and were duplicative.

This court has long believed that all judicial wisdom does not repose in the federal judiciary. The three to two decision of the Supreme Court of Idaho cited by these plaintiffs is an excellent example of that truth. The case is *Thornock v. Boise Independent School District*, 115 Idaho 466, 767 P.2d 1241 (1988). The pull and tug between Judge Huntley speaking for a three judge majority and Chief Justice Shepard, speaking for himself and Judge Bakes, in neither case helps decide the issues here presented. Given the self-proclaimed narrowness of the majority opinion, it is hardly a binding precedent on this court given the factual setting of the evidence and the record in this court.

In addition to the above allowance for attorney fees, the court also awards the plaintiff's costs as outlined in their brief totalling a $1,043.29.

There can be no doubt that these proceedings have been a very expensive learning experience for these two defendants. At best, the results produced under the private attorney general concept are most limited. The delivery of these kinds of educational services was and is an ongoing evolutionary process the improvements of which are attributable to this case in only a minor way.

Patricia Howey, the mother of this child, is an extremely intelligent woman and a highly dedicated mother. When confronted with the fact of a major disability in regard to her daughter Tiffany, she took it upon herself to engage in a program of self-education and in the process, confronted the officials and bureaucracy of those involved in the administration of the school system and the Handicapped Children's Protection Act and related statutory provisions. Understandably, she took a very hard line to get what she thought was necessary and desirable for the education of her child. No one can fault that motivation. One can also understand her tactics. The court was very impressed with the detailed knowledge she had of the statute, regulations and procedures in this regard. However, these very same qualities of determination and inflexibility lead her and her counsel into what Judge Ellis described in *Rossi v. Gosling* on page 1085 as "needless adversariness" in regard to the hearing that was conducted before Jean Rawson in 1987.

It must be emphasized in this regard that this court expresses no personal disrespect for Patricia Howey whatsoever, but is simply commenting and evaluating objective data that has been placed before this court in the record of this case including the evidentiary hearing. This court must also evaluate her credibility as a witness here.

This court was greatly impressed with the professionalism of Jean Rawson, who testified carefully and was vigorously cross-examined by counsel for the plaintiffs. That cross-examination was at times tough and only marginally polite at the hands of Mr. Thomas J. Herr. She had no axe to grind in this proceeding. She is a thoroughly qualified person designated under a system to hear these cases and that process will go on whatever the outcome is

here. She is an attorney of twelve plus years experience and the court was most impressed with her calm professional demeanor on the witness stand and can and does surmise that that same careful deliberate style was evident in the proceedings that she conducted in regard to this case. She candidly confessed that she may have been overly indulgent of counsel in their effort to look under every stone in the administrative hearing.

She opined that the defendants TSC and GLASS were the prevailing parties in the proceedings before her. A very good case can be made for that conclusion, especially in view of *Rossi v. Gosling* and the decision by the 5th Circuit in *Shelly*. This court is constrained to hold that to some very limited extent the hearing and its processes produced, in the language of Justice O'Connor, some "material alteration in the legal relationship of the parties," and therefore, causes this court to examine under *Hensley v. Eckerhart*, the overall success and the reasonableness of fees. In this particular regard, this court is being generous with these plaintiffs.

Jean Rawson also testified to two other very important matters. In answer to questions from this court she testified categorically that the conduct of the plaintiff and counsel in the proceedings before her manifested needless adversariousness. This court is in total agreement. An examination of the record clearly supports that conclusion. Additionally, the conduct of plaintiff's counsel in this very proceeding is a further continuation of that concept. Secondly, and in the same context, the hearing officer Jean Rawson testified that Patricia Howey withdrew the written authorization giving the school authorities access to the medical information of the doctors treating Tiffany Howey. It may well be that in doing so, Patricia Howey was standing on a technical right. The court does not necessarily dispute that. However, there is a line of cases in Indiana that has long established the idea that when a party's medical condition has been put into issue, there is a rather large practical waiver of any patient/doctor relationship. *Collins v. Bair*, 256 Ind. 230, 268 N.E.2d 95

(1971). In the ongoing process of personal injury litigation, this court knows as a matter of judicial knowledge that it is routine to provide for the wide ranging release of medical information. Jean Rawson faulted Patricia Howey for this conduct and this court agrees. In fact, during testimony, Patricia Howey, backed off from this conduct and her lawyer has attempted to explain it away. This court has no intent of overstating the importance of this mother's withdrawal of this medical consent to these school authorities. However, the same did impair the ongoing process of evaluating this child's condition.

The plaintiffs' cite 34 C.F.R. § 300.500(c) and 34 C.F.R. 300.504(b)(2) to justify this action by this child's mother. Section 500(c) states:

"The parent understands that the granting of consent is voluntary on the part of the parent and *may be* revoked at any time." (Emphasis added).

Section 504(b)(2) states:

"Except for preplacement evaluation an initial placement, consent may not be required as a condition of any benefit to the parent or child."

It is hard to see how either of these pieces of the regulations justifies throwing up road blocks in the way of the necessary ongoing process of evaluating this child. More importantly, it manifests a mind set to have it all one's way in this highly personalized context.

An additional point made by Jean Rawson is that this hearing, which lasted for forty-seven hours, is by far the longest such hearing conducted in the State of Indiana and it was protracted from what should have been a two or three day hearing into a long six-day hearing, largely by the conduct of counsel for the plaintiff. This court is in full agreement with that conclusion. It is understandable that when one is confronted with the frustrations of this kind of disability and the attended emotional context it may well be a human failing that causes one so situated to want to throw all of the rocks that can possibly be gathered at the school officials involved. It is apparent that a good deal of that took place and it is also apparent that it was unnecessary. That pattern continued in the hearing before this judge. As understandable as same may be, this court does not conceive that the school authorities should have to pay for counsel to engage in needless adversariness and unnecessarily protract proceedings.

Jean Rawson also clearly testified that most, if not all, of the items that the plaintiffs wanted had been promised to them in advance of the proceeding or in a settlement that occurred during the proceeding. In that she is also entirely correct. In *Hutchinson v. Wells,* Judge Barker was kind enough to cite with approval this court's decision in *Bovey v. City of Lafayette, Indiana,* 638 F.Supp. 640 (N.D.Ind. 1986) in which this court exercised its equitable discretion to apportion the attorney fees between issues upon which a party prevailed and desegregating therefrom issues in which there was no prevailing. This court finds that attorney Stan Miller, who did testify in this proceeding, should have been able to have prepared for, conducted and engaged in post-hearing legal work for a total of hundred hours at his billing rate of Seventy-five Dollars per hour, which is reasonable. Therefore, attorney Stan Miller is allowed a total of Seven Thousand Five Hundred Dollars ($7,500.00). As indicated, these proceedings have been extended and plaintiff's counsel has engaged in needless adversariousness. In some instances, it has been apparent to this court that plaintiff's counsel have engaged in a pattern of deliberate conduct to extend these proceedings and make the same as difficult, disagreeable, and burdensome on the school board and its attorneys as possible.

It cannot be denied that in some small way these plaintiffs have performed some limited function as private attorney generals in the fashion that is discussed by Judge Barker in *Hutchinson v. Wells,* and that accomplishment is folded into the formula that is here announced. As indicated by Judge Easterbrook in *Kurowski v. Krajewski* an hourly rate of One Hundred Dollars per hour is appropriate. In that case an appellate judicial approval was made with regard to a decision by Magistrate Andrew P. Rodovich of this district. This

court's experience involves a few more years than Magistrate Rodovich. In the Lafayette Division of this court One Hundred Dollars per hour may have been slightly high in 1987, it is certainly is not at the present time. Therefore, plaintiff's counsel Thomas Herr only, is allowed One Hundred Dollars ($100.00) per hour for 100 hours that he has devoted to this case, or a total of Ten Thousand Dollars ($10,000.00).

It has also been established on cross-examination of both attorneys Miller and Hurr that there is some duplication of effort, and that there were some items charged that should not have been charged. All of this is taken into account in the court's formulation.

Obviously, with regard to this proceeding before this court, this court is well aware of the conduct of these counsel and have made appropriate comments with reference to the same. The additional costs and expenses in the amount of One Thousand Forty–Three Dollars and Twenty–Nine Cents ($1,043.29) are also awarded.

### IV.

The plaintiff also seeks additional specific award of costs as a paralegal. She has no formal training or certification as a paralegal. The court is unaware of any authority under the facts of this case, or within the statutory provisions here involved for such an award. The decision in the District of Columbia involving the Copyright Act is of no assistance to this plaintiff in this regard. *See Quinto v. Legal Times of Washington, Inc.,* 511 F.Supp. 579 (D.D.C.1981). *Quinto* has not been expanded to a situation where a *party* represented by counsel is awarded fees. In the same circuit it was also held that a *pro se* plaintiff may be awarded fees under the Freedom of Information Act. *Cox v. United States Department of Justice,* 601 F.2d 1 (D.C.Cir.1979). One circuit refused to extend this concept *pro se* prisoner seeking relief under 42 U.S.C. § 1983. *See Crooker v. United States Department of Treasury,* 634 F.2d 48 (2d Cir.1980). *See also Crooker v. United States Department of Justice,* 632 F.2d 916 (1st Cir.1980). None of these cases in any way authorizes a separate award of paralegal fees to this plaintiff. Such is without merit and is DENIED.

The clerk shall appropriately enter judgment awarding attorney fees to Stan Miller in the sum of Seven Thousand Five Hundred Dollars ($7,500.00), and to Thomas Herr in the sum of Ten Thousand Dollars ($10,000.00), and the court costs and expenses in the sum of One Thousand Forty–Three Dollars ($1,043.29). Judgment therefore shall be entered against these defendants. IT IS SO ORDERED.

APPENDIX A

HEARING DECISION

INDIANA RULE S–1

CHILD: TIFFANY HOWEY

PETITIONER: CLARK and PATRICIA HOWEY
Route # 1, Box 106
West Point, Indiana 47992

PETITIONER'S
REPRESENTATIVE: STAN MILLER, ESQUIRE
Dunn and Hargitt Building
Second and Columbia Streets
P.O. Box 158
Lafayette, Indiana 47902

RESPONDENT: TIPPECANOE SCHOOL CORPORATION
21 Elston Road
Lafayette, Indiana 47905

and GREATER LAFAYETTE AREA SPECIAL SERVICES
 2300 Cason Street
 Lafayette, Indiana 47905

RESPONDENT'S
 REPRESENTATIVE:MARGARET M. BANNON
 BOSE, McKINNEY and EVANS
 ·1100 First Indiana Building
 Indianapolis, Indiana 46204

 HEARING DATES:October 9, 1987, October 16, 1987
 November 9, 1987, November 23, 1987
 November 30, 1987 and December 16, 1987

DATE OF HEARING
 REPORT:January 7, 1988
 /s/ M. Jean Rawson
 HEARING OFFICER:M. JEAN RAWSON
 Attorney at Law
 905 Ridge Road
 Munster, Indiana 46321
 (219) 836–1413

## EXHIBITS PRESENTED
### RESPONDENTS' EXHIBITS

Respondents' Exhibit 1 Student's medical information (is contained in Exhibit A & Y of Petitioner's Exhibit)

Respondents' Exhibit 2 1986–87 IEP Materials
 2a 1986–87 IEP
 2b November 7, 1986 request from parent
 2c November 21, 1986 case conference report
 2d November 24, 1986 letter from parent
 2e March 9, 1987 IEP update
 2f March 9, 1987 parent request for additional services
 2g April 6, 1987 conference summary

Respondents' Exhibit 3 Student's elementary record

Respondents' Exhibit 4 1987–88 IEP Materials
 4a IEP proposed by parent
 4b June 10, 1987 case conference materials
 4c June 17, 1987 memo regarding June 10, 1987 case conference
 4d Revocation of parent consent for release of information
 4e July 1, 1987 letter from J. Skelton
 4f July 14, 1987 letter from J. Skelton and attached IEP
 4g Offer to begin 1987–88 program

Respondents' Exhibit 5 Speech Materials
 5a March 19, 1986 testing by Indianapolis Speech and Hearing Center
 5b February 11, 1986 permission for testing
 5c May 13, 1986 case conference materials
 5d Summary from Wabash Center
 5e November 20, 1986 case conference materials
 5f March 5, 1987 memo from GLASS speech therapist

Respondents' Exhibit 6 Hearing Materials
 6a April 9, 1986 Purdue evaluation
 6b Fall 1986 hearing report
 6c December 10, 1986 Purdue evaluation
 6d June 5, 1987 Purdue evaluation
 6e July 24, 1987 letter from Dr. Berner
 6f September 3, 1987 letter from Dr. Binnie

Respondents' Exhibit 7 Physical Therapy Materials
 7a October 3, 1985 permission for testing

7b October 3, 1985 physical therapy report
7c 1985–86 progress notes of M. William
7d 1986–87 progress notes of S. McCoy
7e October 29, 1986 letter from Dr. Perruquet
7f November 20, 1986 progress report
7g November 21, 1986 recommendations
7h March 26, 1987 recommendations
7i May 29, 1987 follow-up report
7j August 28, 1987 evaluation by M. William
7k September, 1987 permission and recommendations
7l PT progress report of November 18, 1987 by S. McCoy

Respondents' Exhibit 8 Adaptive Physical Education Materials
8a September 4, 1986 parent permission to evaluate
8b November 17, 1986 consultation report
8c January 30, 1987 evaluation
8d March 7, 1987 letter from Dr. Perruquet

Respondents' Exhibit 9 Occupation Therapy Materials
9a April 16, 1986 parent permission to evaluate
9b October 3, 1986 parent permission to evaluate
9c October 16, 1986 evaluation
9d 1986–87 therapy progress notes
9e March 23, 1987 evaluation
9f September 4, 1987 parent permission to evaluate
9g September 18, 1987 recommendations

Respondents' Exhibit 10 Memos and notes pertaining to September 3, 1987 in-service meeting
11 O.C.R. Report

## EXHIBITS PRESENTED
## PETITIONERS' EXHIBITS

"A" Description of EDS and Tiffany Howey's specific medical condition
"B" Tiffany Howey's allergies and Dr. Stoltz's recommendations regarding rests and snacks
"C" Emergency medical procedures
"D" GLASS file regarding parental rights notice on 10/31/85 and 2/10/86.
"E" Parental requests for evaluations and services
"F" Transcript of case conference of 11/21/86
"G" Adaptive Equipment recommendations
"H" Evaluations and recommendations for speech therapy, OT and PT
"I" Recommendation for placement at Murdock by Susan McCoy
"K" Out-of-Pocket costs of Tiffany Howey's parents
"L" Purdue University Audiological Evaluations
"M" IEP's and case conference reports
"N" Case conference attendance sheets.
"O" Adaptive P.E. recommendation by occupational therapist.
"P" Adaptive P.E. medical recommendations.
"Q" Unilateral change of placement.
"R" School records regarding Tiffany Howey's lost classroom time.
"S" Directive not to perform consult to Susan McCoy from Paul Lane
"T" Transcript of 6/10/87 case conference
"U" Proposed IEP prepared by GLASS prior to 6/10/87 meeting
"V" Latest audiological evaluation by Dr. Berner
"W" GLASS refusal of summer instruction for Tiffany Howey
"X" Petitioners' suggested IEP

**1496**

"Y" Miscellaneous
"Z" GLASS Procedures Manual
"AA" Dr. Susan Aufderheide's Evaluation of October 12, 1987
"BB" Mary Ann Zander's O.T. Report
AND Respondents' Answers to Interrogatories Propounded by Petitioners

## WITNESSES CALLED
### RESPONDENTS' WITNESS LIST

1. PAUL LANE Director of Special Education GLASS
2. JUDITH SKELTON GLASS Consusltant for PH and MR
3. KRISTEN WEIDENAAR Teacher
4. COLLEEN NEAL Teacher
5. MAXINE BALKEMA Teacher
6. JOHN PRICE Principal, Mentonye Elementary
7. CAROL HESSION Audiology Intern, Purdue University
8. DR. CARL BINNIE Audiologist, Purdue University
9. SUSAN McCOY GLASS Physical Therapist
10. DEBORAH TILLETT GLASS Consultant for A.P.E.
11. STEVEN ZINSELMEIER P.E. Teacher
12. CELESTE DRYSDALE Occupation Therapist
13. MARY ANN ZANDER GLASS Occupational Therapist
14. RUTH ANN FERRIS Speech Clinician
15. DEBRA PREWETT MORRIS Speech Clinician
16. JANET BATTA Speech Clinician

## WITNESSES CALLED
### PETITIONERS' WITNESS LIST

1. DEBORAH BAKER Occupational Therapist
2. CONNIE FREEMAN Advocate
3. JODIE HICKS Sister of child
4. SUSAN AUFDERHEIDE Ph.D. in Adaptive P.E.
5. MARSHA WILLIAN Physical Therapist
6. MRS. CLARK HOWEY Parent
7. MR. CLARK HOWEY Parent

---

## HEARING DECISION

### INTRODUCTION

Clark and Patricia Howey, (hereinafter referred to as the "parents"), are the parents of Tiffany Howey (hereinafter referred to as "the child"), who is an eight-year-old child that was classified as physically handicapped (diagnosed as having Ehlers' Danlos Type IV) by the Tippecanoe School Corporation and the Greater Lafayette Area Special Services (GLASS) (hereinafter referred to as "the school") in October of 1985. The parents requested an S–1 Hearing on August 21, 1987. Representatives of the parents and the school agreed to an extension of time and the hearing was conducted on October 9, 1987, October 16, 1987, November 9, 1987, November 23, 1987, November 30, 1987 and December 16, 1987 at the Lafayette School Board Room. The parties stipulated and agreed that the

issues to be decided by this hearing officer were as follows:

1. Whether the proposed IEP for 1987–1988 was appropriate for the child.

2. Whether the parents are entitled to reimbursement for their costs expended for related services and independent evaluations in 1985–86, 1986–87, and 1987–88.

3. Whether GLASS's (the school's) procedures and practices regarding notice of parental rights in 1985–86 and 1986–87 were proper.

The parents stipulated to the introduction of the school's Exhibit 1a–11b. The parents withdrew Exhibit "J" and the school stipulated to the introduction of parents' Exhibits "A"–"BB" (with the exception of Exhibits "F" and "T"). The school objected to the admission of Exhibits "F" and "T" for the reason that each was a transcription of a tape of a case conference meeting taken by the parents and each had "gaps" in the transcription. After considering the arguments of both parties, and being cognizant of the fact that a parent *can* tape record a case conference committee (EHA 1986 *Blades* 2211:408) and can have it transcribed and introduced as documentary evidence at an S–1 Hearing, this hearing officer admitted Exhibits "F" and "T" with the response that those exhibits might be given less weight than the others because of the "gaps". The hearing was open to the public, but the parties agreed to a separation of witnesses and witnesses were admonished not to discuss their testimony. The press was allowed to be present at the hearing, but TV camera lights were not allowed in the hearing room, pursuant to the school's objection. This hearing officer felt that the open door policy (I.C. 5–14–1.5–1) was not violated since the reporters were present, but that reasonable restrictions could be imposed. It was felt that the equipment was distracting to the hearing participants and that the distraction would have interfered with the administration of justice (see 1984 Attorney General Opinion 84–9 and Code of Judicial Conduct, Canon 3(A)(7).)

## FINDINGS OF FACT

1. APPROPRIATENESS OF PROPOSED 1987–88 IEP

A. The parents revoked their consent for information on June 23, 1987 (Exhibit 4d) which prevented the school and the case conference committee from having access to medical records and other evaluations to aid them in developing an appropriate IEP.

B. The child is in a regular classroom with special services designated in her IEP because of her physical handicap. The school and the parents disagree in the following areas of the proposed IEP:

(1) *Adaptive P.E.* Disagreement exists as to who will provide the service, if the service will be a direct or related service, and if swimming will be included.

(2) *Speech–Hearing.* The parties disagree whether direct or indirect services are needed for speech and what the IEP should include to address the problem of the child's hearing deficiency.

(3) *Tutoring.* The parties disagree whether tutoring is necessary.

(4) *Vocational Education.* The parties disagree as to what extent a computer will be utilized by the child and who will deliver the services of instruction in computer and/or teaching keyboard to the child.

(5) *Occupational Therapy/Physical Therapy.* The parties disagree as to who will deliver these services, how often the services will be delivered, and if the services rendered will be "direct—hands on—", or if they will be consultation services.

C. Not all school personnel who instructed the child were included in all of the case conferences and not all the personnel had seen the child's current IEP.

D. Not all attendees at the June, 1987 case conference were given copies of the "Tentative IEP" by either the school or the parents. Both the school and the parents had apparently developed their own IEP to use as a working guide and each apparently considered this to be "the IEP".

E. The Speech, Language and Hearing IEP is a separate document and is not

always attached to or kept with the child's other IEP. Apparently separate case conferences are also held.

F. The parties disagree about which meetings held were "case conferences" from which IEPs were to be developed and which meetings held were not case conferences.

2. REIMBURSEMENT FOR THE PARENTS FOR THEIR COST EXPENDED FOR RELATED SERVICES AND INDEPENDENT EVALUATIONS IN 1985–86, 1986–87, AND 1987–88

A. The parents request to be paid for transportation costs for transporting the child to school daily. The school has agreed (see Lane's testimony, October 9, p. 14; Skelton's testimony, October 9, p. 247, and the March 9, 1987 IEP which lists "transportation" as a related service). The parties disagree as to the rate of compensation.

B. Dr. Susan Aufderheide prepared an adapted physical education evaluation of the child on October 12, 1987 (Exhibit "AA") at the request of the parents. Costs for the said evaluation are not paid.

C. The child obtained audiological testing at Purdue University, on April 9, 1986, December 10, 1986 and June 5, 1987, which they request be paid by the school. Some of the bills have been paid by the parents. In addition, the parents paid Dr. Daniel R. Berner for an ENT evaluation for which they seek reimbursement.

D. The child attends Adaptive Physical Education classes on Tuesdays and Thursdays at Purdue University, (nine weeks each semester) and costs are borne by the parents.

E. The child has a private physical therapist (Marsha Willian) who renders direct services and the costs are borne by the parents.

F. The parents had an occupational therapy evaluation performed by Deborah Baker and a physical therapy evaluation performed by Marsha Willian and seek reimbursement for those costs.

3. GLASS (THE SCHOOL'S) PROCEDURES AND PRACTICES REGARDING NOTICE OF PARENTAL RIGHTS IN 1985–86 AND 1986–87

A. The parents allege that they were never given any written "Notice of Rights". There was no evidence presented to show that the parents received written notice other than the exhibits which show the parents' signature on "Permission to Place" and "Permission to Evaluate" forms on October 3, 1985 and May 13, 1986, wherein the parents signed, "I have been given a copy, with full explanation, of the following: ... the Notice of Parents' Rights."

B. One of the school's witnesses testified that rights were only given "if the parents asked for them" and that rights were sometimes explained "over the telephone" (See Ferris' testimony, November 30, p. 225).

C. The school's published "Notice of Parent Rights" (Exhibit "Z", page SE–1) is 3½ pages long, is in very small print, and is very difficult to read. One of the school's witnesses testified that "it was such a long document and many parents were so frightened by it". (See Ferris testimony, November 30, p. 224).

D. The parents allege that they were not given any written notice of rights when there was a change in placement in the child's speech program at the November 21, 1986 case conference. Even though the initial change to "indirect services" was not agreed to by the parents and even though no permission was signed until May 1, 1987, the form, nevertheless, states, "I have been given a copy with full explanation of the following: ... The Notice of Parent Rights." The same language also appears on the form dated May 15, 1987 and signed by the parent when they consented to the change, even though the parent commented on the form that she was "asked to sign the document six months

after the placement had already been changed." (See Exhibit "Q").

E. There are misunderstandings by the parents as to when and what rights are to be given to them, *i.e.:* Do they have to be given rights at the case conference? Do they have to be told orally or in writing? Do they have to be told that they have the "right to dissent" to the IEP? In other words, is it the school's obligation to give parents a "Miranda-type" warning at all "critical stages" of the proceedings?

## CONCLUSIONS OF LAW

### 1. APPROPRIATENESS OF PROPOSED IEP

A. The parents must immediately reinstate their consent for the mutual exchange of information about the child. It is necessary for all evaluations and records to be included in a case conference report and to implement a proper IEP (Rule S-1, 1-E; 1-M). The school is to follow Rule S-1, 2-C guidelines regarding confidentiality.

B. The March, 1987 IEP as written is inappropriate. A case conference committee must immediately be reconvened and new IEP should be written to address the needs of this child which complies with the law as hereinafter stated.

(1) The IEP must include: (a) a statement of the child's present levels of educational performance; (b) a statement of the annual goals and short term instructional objectives; (c) a statement of specific special education and related services and extent of participation in regular education; (d) projected dates for initiation and anticipated duration of services, and (e) the appropriate objective criteria, evaluation procedures and schedules for review of placement on an annual basis. (Rule S-1, Sec. 1-M; USCA 20 Sec. 1401(19)).

(2) The IEP must contain specific goals and objectives. The purpose of the annual goals and short term objectives is to provide a mechanism for determining whether the child is progressing and whether the special education program is appropriate to the child's special needs. Annual goals describe what the child can reasonably be expected to accomplish in a twelve month period, and short term instructional objectives are intermediate steps between the child's present level of performance and the annual goals established for the child. The short term objectives are measurable, intermittent steps between a handicapped child's present levels of educational performance and the annual goals that are established for the child. The objectives are developed based on a logical breakdown of the major components of the annual goals, and can serve as milestones for measuring progress towards meeting the goals. In some respects, IEP objectives are similar to objectives used in daily classroom instructional plans. For example, both kinds of objectives are used (1) to describe what a given child is expected to accomplish in a particular area within some specified time period, and (2) to determine the extent to which the child is progressing toward those accomplishments. (*Department of Educational Policy Interpretations: IEP Requirements, Individual Educational Programs, Interpretations of Requirements Under Part B of the Education of the Handicapped Act as Amended by Public Law 94-142, 46b Federal Register 5460.*)

The proposed IEP does not have short term objectives in all instances. Some of the IEP goals have been written as the school goals rather than the child's goals. This needs to be corrected.

C. *Specific Areas of IEP*

(1) *Adaptive P.E.*

Rule S-1, 1-X states that physical education includes adaptive physical education. The evidence in this case is overwhelming that this child must have adaptive P.E. included in her IEP. That adaptive P.E. should be offered during the school day as a direct service. There are two adaptive P.E. evaluations in the record, which should be taken into consideration by the case conference committee in writing a new IEP. The testimony of that evaluator, Dr.

 Susan Aufderheide, is that a regular P.E. teacher, who has had some courses in adaptive P.E., can administer the course. (see Aufderheide testimony, December 16, p. 53; 70) The school should, therefore, be sure that the person or persons (Tillett and/or Zinselmeier) selected to do the adaptive P.E. program is properly trained and is fully cognizant of the needs of this particular handicapped child. The selected teacher or teachers should be integral members of the case conference committee which writes the child's IEP and periodic Evaluations should be done. Serious consideration should be given (based on all of the expert's testimony) to include swimming in the adaptive P.E. plan for this child if the same can be accomplished within the school system.

### (2) *Speech/Hearing*

The evidence presented at the hearing is that the child has a mild fluctuating hearing loss and is now wearing a hearing aid. All of the child's teachers must be made aware of the child's need for preferential seating and this should be stated in the IEP.

Speech services must be included in the IEP. Whether the services are to be direct or indirect should be indicated by current testing and evaluation. If the school has qualified personnel (Batta), she may evaluate. The speech teacher should have more of an input in the case conference committee and should make the speech IEP a part of the child's overall IEP. The goals must be written in terms of measurable goals for the child and there must be no break in the continuation of those speech services (i.e., speech, if offered directly to this child, should begin at the beginning of each school year—not months into the semester).

The Education for All Handicapped Children Act Regulations state that IEPs must contain the projective dates for initiation of services and the anticipated duration of the services. The special education and regulated services set out in the child's IEP must be provided by the school as soon as possible after the IEP is made final. If a child is retained in the present program, special education services continue from the previous year and begin again on the first day of school of the following year. (34 CFR Sec. 300.342)

### (3) *Tutoring*

The evidence is conflicting as to the need for tutoring for this child. Tutoring should be addressed at this case conference and at annual case conferences each year. The classroom teacher's input should be seriously considered by the case conference committee in determining whether, because of her inability to keep up for physical reasons and because of any excessive absences, the child should have tutoring included in her current IEP.

### (4) *Vocational Education*

There appears to be no conflict that a computer (specifically a Zygo) will be utilized by this child during the 1987–88 school year. Accordingly, goals and objectives must be written to utilize the use of such computer. Keyboarding must be taught immediately. The skills can be taught by a regular classroom teacher if that teacher is first trained by a physical therapist and if the physical therapist monitors the activity on a regular basis, (see Baker testimony, November 30, p. 344 and Willian testimony, December 16, p. 145). The IEP should so indicate.

### (5) *Occupational Therapy/Physical Therapy*

The evidence indicates that occupational therapy and physical therapy are needed by the child on a weekly basis. The IEP must include both and the services rendered should be direct—"hands on" services, provided a physician's prescription so indicates. Consultation in the classroom should be done on a monthly basis. A qualified occupational therapist and a qualified physical therapist must be used. If the school has qualified personnel (Zander and McCoy), they may be utilized. It is suggested that these two therapists consult each other regularly to see that their pro-

grams achieve the desired results without a lot of overlap.

Rule S–1 includes occupational therapy and physical therapy as "related services". Occupational therapy is a service, provided through direct therapy and/or therapist-directed/teacher-implemented classroom programming, which evaluates and trains in the areas of gross and fine motor function, self care, and sensory and perceptual-motor integration with the intent of strengthening the child's ability to function as independently as possible. Physical therapy refers to those habilitative and/or rehabilitative services, provided through direct therapy and/or consultation, which evaluate individual developmental levels, functional abilities, reflex level, range of motion, muscle strength, perceptual motor level and respiratory functions. Treatment objectives and programs are planned in accordance with the evaluation results and are implemented by a licensed physical therapist. The licensed physical therapist evaluates, recommends, and/or adapts assistive equipment. The licensed physical therapist practices under the referral of a physician with an unlimited license to practice medicine. (Rule S–1, 1–U; 1–Y) According to *Delivery of OT–PT Services in Special Education Programs—Indiana Guidelines,* "consultation" is reserved for a student who has reached a level of functioning within the limits of her disability but may progress. The evidence presented is that this child is in need of more than "consultation"; it is the conclusion of this hearing officer that she needs a direct, hands-on program. However, a physician's prescription must be obtained for the same.

D. All school personnel who instruct this child must participate in all case conferences and all must have input in writing the child's IEP. Although it is not inappropriate to use a "tentative IEP" as a work sheet, the same should be prepared by the school and made available to all members of the case conference committee. No one at the case conference committee should feel that he/she can dictate all of the terms of the IEP. All of the IEPs and materials that are considered a part of the IEP must

be kept together in one central file. The total IEP must be made available to all personnel dealing directly with this child and to the parents promptly after its approval. Proper written notice of all case conferences must be given to all personnel and to the parents. The proper notice utilizing the S–1 guidelines (see Rule S–1, 3–F) should eliminate the confusion as to which meetings are "case conferences" and which meetings are not case conferences.

## 2. REIMBURSEMENT TO PARENTS FOR RELATED SERVICES AND EVALUATION EXPENSES.

### A. *Transportation.*

The school is to reimburse the parents for costs of transportation for the child at the same rate as the bus drivers are compensated by the school. Said compensation at said rate should be retroactive to March 9, 1987. Transportation is clearly a "related service" made available to the parents at no cost. (Rule S–1, 1–BB)

### B. *Adaptive P.E. Evaluation*

Dr. Susan Aufderheide's October 12, 1987 evaluation must be paid for by the parents as it was clearly an "additional evaluation". The school paid for Dr. Aufderheide's first evaluation and had indicated a willingness to have their own evluation performed by school personnel (See Lane's testimony, October 9, p. 158) Further, Dr. Aufderheide testified that she had told the school "that if they had a person on their staff who was certified to do it, that they could just use that person." (See Aufderheide's testimony, December 16, p. 45)

However, the evaluation of Dr. Susan Aufderheide must be considered by the case conference committee in implementing the child's new IEP.

The parents may obtain an independent educational evaluation at their own expense. Each school shall provide to the parent, on request, information about where an independent educational evaluation may be obtained. If the parent obtains an evaluation at private expense, the results of the evaluation must be con-

 sidered relative to any decision made with respect to the provision of a free appropriate public education to the child, and may be presented by the parent as evidence at a hearing regarding that child. (Rule S–1, 2–5)

C. *Audiological Testing at Purdue*

The school must bear all the costs of the hearing testing done at Purdue. The child was referred to Purdue by the school initially for testing and the subsequent testing was a follow-up. Audiology and medical services for diagnostic or evaluation purposes are clearly within the definition of "related services", (Rule S–1, 1–BB) and the tests were neither "additional evaluations" nor "independent evaluations". The parents must be reimbursed by the school for any amounts they have paid to Purdue for these tests.

The parents are responsible for the costs of the two ENT evaluations done by Dr. Daniel R. Berner. Even though Purdue might have suggested a physician's evaluation, these evaluations are clearly "additional" and "independent" evaluations at the parents' expense. (Rule S–1, 2–J)

D. *Adaptive P.E. Classes at Purdue.*

The parents must bear the expenses for any adaptive P.E. classes the child takes in the future at Purdue for the reason that adaptive P.E. will be offered to the child as a direct service during the regular school day. (See *discussion on adaptive P.E.*) The adaptive P.E. classes at Purdue are "something in addition to what she's doing at school." (See Aufderheide's testimony, December 16, p. 97) The school must, however, reimburse the parents for any expenses incurred for the Purdue program (not covered by insurance) up to the date of this decision since adaptive P.E. has not been properly provided to this child thus far.

E. *Costs of Child's Private Physical Therapist*

The parents must bear the expense of their private physical therapist (Marsha Willian). Since the school will be providing physical therapy as a direct service during the school day (see discussion on OT/PT), the child's private physical therapy must be at the parents' expense as an additional service. The reports of Marsha Willian must, however, be considered by the case conference committee in implementing the child's IEP. It is suggested that the private therapist consult with the school's therapist on a regular basis and that the private therapist be included in the case conference committee. No reimbursement is to be made to the parents for the physical therapy provided by the private therapist to date since the school has been providing physical therapy (consultation) services.

F. *Occupational Therapy Evaluation and Physical Therapy Evaluation*

The parents must incur the costs of both the occupational therapy evaluation performed by Deborah Baker and the physical therapy evaluation performed by Marsha Willian because both evaluations were sought by the parents. Each evaluation was clearly an "additional evaluation" which is at the parents' expense. (Rule S–1, 2–J) These evaluations, however, shall be considered by the case conference committee in implementing the child's new IEP.

3. PARENTAL NOTICE OF RIGHTS PROCEDURES

A. There is insufficient evidence to indicate that the parents of the child were not adequately advised by the school of their rights at the time of the initial placement or at the convening of each case conference meeting, since all of the consents indicating that rights were received were signed by the parents. However, no physical evidence was presented showing the receipt of the written rights other than the consent forms.

Rule S–1, 3–F requires adequate notice to the parent in his/her native language as of the date, time and place of case conference meetings. The notice must include the following information: (1) purpose of the meeting, (2) a listing of the expected participants and notice that the parent may

request the participation of and/or be accompanied by any other individual of the parents' choosing, and (3) a listing of the collective data to be discussed.

When the case conference has forwarded its report to the superintendent, within ten (10) days written notice of the superintendent's proposal shall be presented to the parents, there shall be written notice which shall:

(1) Include a description of all evaluation procedures, test records or reports used as a basis for the programs; dissenting opinions, if any; and a placement recommendation;

(2) Explain the reasons for the placement recommendation including a description of any options considered and the reasons why those options were rejected;

(3) Describe any alternative educational opportunities available on a permanent or temporary basis;

(4) Describe any other factors relevant to the proposed placement;

(5) Inform the parents of the opportunity to meet with the superintendent or his/her designee and/or the local Board of Education to attempt to resolve any objections;

(6) Inform the parents of the right to object to their proposed action at a hearing before an independent hearing officer, and of the manner in which to request such a hearing;

(7) Inform the parents that the parents may obtain an independent educational evaluation;

(8) Inform the parents of any organizations providing assistance with respect to placement questions;

(9) Inform the parents of the right to be represented at the hearing by legal counsel; to present evidence, including expert medical, psychological, and educational testimony; and to confront, cross examine, and compel the attendance of witnesses who may have evidence upon which the proposed action is based;

(10) Inform the parents of the right to examine and copy child's school records at any time during regular office hours, including all tests and reports with respect to identification, evaluation, and educational placement and provision of a free appropriate public education;

(11) Inform the parents of the right to have access at the local level to all federal and state laws and rules pertaining to special education; and

(12) Inform the parents of all the procedural safe guards available regarding protection in evaluation procedures, least restrictive environment, confidentiality of information, and all other due process procedures. (Rule S–1, 3–F)

B. The change in speech services from direct to indirect was a "change in placement". As such, written notice should again have been given to the parents. Even though no specific written rights were introduced into evidence, the parents signed forms indicating that they had received notification of their rights on May 1, 1987 and on May 15, 1987.

Written prior notice must be given to the parents or guardians of the child whenever such agency or unit: (1) proposes to initiate or change, or (2) refuses to initiate or change, the identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child. The notice must contain a complete explanation of the education for all handicapped children procedural safeguards, a description and explanation of the school's proposed action, a description of rejected options and reasons for rejecting them, a description of all evaluation procedures used in making the decision and a description of any other relevant factors. The notice must be written and must be understandable to the general public and must be in the parents' native language. (Rule S–1, 1–I; USCA 1415(6)(1)(C)).

Since the parents signed a number of forms indicating that they had received no-

tification of their rights, and since one of the parents read from her own copy of Rule S–1 and distinguished U.S. Supreme Court cases to this hearing officer during the course of the hearing, (see Howey testimony, December 16, pp. 415–417), it is concluded that these particular parents were not unaware of their rights. The error, if made, was "harmless".

However, all of the school personnel must be more cognizant of the importance of parental rights and must insure that written notice of rights are promptly given in each instance as provided by law. Obviously rights must be given whether asked for or not, and rights should be given in writing, not orally or over the telephone. The written rights should be orally explained, if necessary, and all written notices of rights should be signed and dated by the parents with both the school and the parents retaining a copy. The school should republish its written "Notice of Parent Rights" in larger, more readable print, so that the rights are easier for parents to understand.

C. The parents must write their dissent on the IEP before it leaves the case conference committee. Rule S–1, 1–E states that the written case conference report shall include ... "dissenting opinions, if any ...". This is one of the rights that should be included in any "notice of rights".

D. Parents do not have to be given a "Miranda-type" warning at all "critical states" of the proceedings. The school simply must give parents a written notice of rights at all times required by Rule S–1.

## DECISION

Applying the law to the facts of this case, it is therefore, ORDERED that:

1. The parents immediately reinstate their Consent for Information.

2. A case conference be immediately called to develop an appropriate IEP for the child with the following guidelines in mind:

A. Goals and objectives must be those of the child and must be specific enough for proper measurement.

B. Adaptive P.E. must be included in the IEP with swimming provided if the same can be accomplished within the school system.

C. The IEP must include a statement that because of the child's hearing problem, she must be given preferential seating. The IEP must include a speech program; whether those speech services are direct or indirect should be determined yearly by an evaluation. There must be no break in the continuation of those services.

D. The need for tutoring should be considered by the case conference committee, utilizing the input of the current classroom teacher.

E. Keyboarding must be taught immediately by a classroom teacher trained and monitored by the physical therapist and a computer utilized by the child during the 1987–88 school year.

F. Occupational therapy and physical therapy must be provided by qualified personnel. If a physician's prescription indicates, the services should be direct services on a weekly basis with monthly consultations in the classroom.

G. All school personnel who are involved with the child must be present at all the case conferences and must assist in developing the IEP.

H. The *complete* IEP is to be promptly made available to the parents and all school personnel involved with the child.

3. The school is to reimburse the parents for costs of transportation for the child at the same rate as the bus drivers are compensated, retroactive to March 9, 1987.

4. The parents are responsible for the payment of the following: Dr. Susan Aufderheide's October 12, 1987 evaluation; the child's future adaptive P.E. classes at Purdue; the evaluations of Baker (OT) and Willian (PT) and Dr. Daniel R. Berner's ENT evaluation.

5. The school must reimburse the parents for costs of Purdue audiological testing and for the expenses of the Purdue adaptive P.E. program to date (not covered by insurance).

6. Although there is insufficient evidence to indicate that the parents were not given their rights, school personnel must insure that written notice of rights are given to parents in all instances dictated by Rule S–1. The "Notice of Parent's Rights" should be revised in a more legible and understandable form. Parents should sign and date "Notice of Parent's Rights" and both parent and school should retain a copy.

### NOTICE OF RIGHT TO APPEAL

Within twenty (20) days from the filing of the hearing officer's findings, conclusions and dated decision, any party to the proceeding before the hearing officer may file a Petition for Review of the hearing officer's findings, conclusions, and dated decision or to any other part of the record or proceeding with the Board of Appeals. The filing and pendency of a Petition for Review shall operate to stay the effectiveness of the decision of the hearing officer unless otherwise ordered by the Board of Appeals. Rule S–1, 2(H)(3).

Should no appeal be registered, this decision should be implemented within thirty (30) school days following the date hereof.

DATED: January 7, 1988

/s/ M. Jean Rawson
M. JEAN RAWSON
Hearing Officer
905 Ridge Road
Munster, IN 46321
(219) 836–1413